**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAVE LONG BEACH ISLAND, INC., a non-profit corporation, P.O. Box 579, Ship Bottom, NJ 08008; ROBERT STERN, PHD., 329 4th Street, Beach Haven, NJ 08008; SAVE THE EAST COAST, INC., a non-profit corporation, P.O. Box 26 Asbury Park, NJ 07712; PROTECT OUR COAST – LINY, 361 E Broadway Long Beach, NY 11561; CAPTAIN ALAN SHINN, 100 Fairview Place, Neptune Township, NJ 07753; BOROUGH OF SEASIDE PARK, 1701 North Ocean Avenue, Seaside Park, NJ 08752; | |
| *Plaintiffs*, | |
| | Case No. |
| v. | Judge |
| U.S. DEPARTMENT OF COMMERCE, 1401 Constitution Avenue, NW, Washington, DC 20230; HOWARD LUTNICK, in his official capacity as Secretary of Commerce, 1401 Constitution Avenue, NW, Washington, DC 20230; NATIONAL MARINE FISHERIES SERVICE, 1315 East-West Highway, Silver Spring, MD 20910; and EUGENIO PIÑEIRO SOLER, in his official capacity as Assistant Administrator, National Marine Fisheries Service, 1315 East-West Highway, Silver Spring, MD 20910; BUREAU OF OCEAN ENERGY MANAGEMENT, 1849 C Street NW, Washington, DC 20240; WALTER CRUICKSHANK in his official capacity as the Director of the Bureau of Ocean Energy Management, 1849 C Street NW, Washington, DC 20240; US DEPARTMENT OF INTERIOR, | |

1

1849 C Street NW, Washington, DC 20240;
DOUG BURGUM, Secretary of the Interior, in
his official capacity as Secretary of the Interior,
1849 C Street NW, Washington, DC 20240;

*Defendants*

**Complaint For Declaratory And Injunctive Relief to Set Aside Final Agency Action**

Plaintiffs SAVE LONG BEACH ISLAND, INC., ROBERT STERN, PH.D.,  SAVE THE

EAST COAST, INC., PROTECT OUR COAST – LINY, INC., CAPTAIN ALAN SHINN, and

BOROUGH OF SEASIDE PARK; ("Plaintiffs") by its attorney file this Complaint against

Defendants UNITED STATES DEPARTMENT OF COMMERCE; UNITED STATES

SECRETARY OF COMMERCE HOWARD LUTNICK; NATIONAL MARINE FISHERIES

SERVICE; DIRECTOR OF THE NATIONAL MARINE FISHERIES SERVICE, EUGENIO

PIÑEIRO SOLER; BUREAU OF OCEAN ENERGY MANAGEMENT; DIRECTOR OF THE

BUREAU OF OCEAN ENERGY MANAGEMENT WALTER CRUICKSHANK; and, US

DEPARTMENT OF INTERIOR; SECRETARY OF THE INTERIOR DOUG BURGUM

("Defendants"), and allege the following.

**Nature of the Action**

1.    This is an action for declaratory and injunctive relief, challenging the failure of the

National Marine Fisheries Service ("NMFS") and Bureau of Ocean Energy Management's

("BOEM") to comply with the Marine Mammal Protection Act ("MMPA") and its implementing

regulations, the National Environmental Policy Act ("NEPA") and its implementing regulations, the Outer Continental Shelf Lands Act ("OCSLA"), its implementing regulations, and the Administrative Procedures Act ("APA"). Plaintiffs seek orders vacating and setting aside as unlawful the Incidental Take Authorization/Letter of Authorization[1] (hereinafter, "ITA") issued by NMFS for Empire Offshore Wind, LLC, EW1 and 2, (hereinafter, "Empire Wind") on 2/22/2024. The NMFS' approval of this ITA was arbitrary and capricious for the reasons delineated *infra*. Plaintiffs also seek orders vacating and setting aside the Empire Wind Record of Decision and Construction and Operations Plan.

2.     In this suit, Plaintiffs ask this Court to invalidate the putative MMPA ITA approval of the Empire Offshore Wind Project until and unless the Federal Government complies with the relevant statutes and regulations.

## Jurisdiction and Venue

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1346 (United States as defendant), 16 U.S.C § 1361 et seq. (MMPA), 42 USCS § 4321 et seq. (NEPA), 43 U.S.C. § 1331 et seq. (OCSLA), 28 U.S.C. § 2201 (declaratory judgment),  28 U.S.C. § 2202 (injunctive relief) and 5 U.S.C. § 701 through 706 (APA).

4.     Final agency decisions are subject to judicial review. Plaintiffs have met all applicable statute of limitations, namely, the six-year statute of limitations, pursuant to 28 U.S.C. § 2401, and the two-year statute of limitations for FAST-41 Act, set forth at 42 USCS § 4370m-6(a)(1)(A).

---

[1] https://www.fisheries.noaa.gov/action/incidental-take-authorization-empire-offshore-wind-llc-construction-empire-wind-project-ew1

5.    For all claims brought under the APA, Plaintiffs have exhausted all administrative remedies available to them.

6.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e) because all of the Federal Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**Parties**

7.    Plaintiff SAVE LONG BEACH ISLAND is a 501(c)(3)non-profit corporation, of over 10,000 supporters, organized under the laws of New Jersey, and created to guard human and natural resources. These resources include, for example: marine mammals, fish, and other species that inhabit, use, or migrate off the New Jersey and New York coasts; the aesthetic elements of Long Beach Island and the New York Bight; economic interests strongly tied to the maintenance of the environmental features comprising Long Beach Island and the New York Bight, inter alia. These resources, in particular, the marine mammals off the NJ and NY coasts, are being harmed, harassed, and killed, in large part by the activities authorized by NMFS and BOEM in the waters of the NJ/NY Bight. These marine mammals, not only are exceptionally important to the oceanic ecosystems, but they also impart carbon dioxide mitigatory effects. Save Long Beach Island supporters have a legally protected interest in preserving the marine mammals, some of which, like the North Atlantic Right Whale, are critically endangered species. Save Long Beach Island, Inc. recently prepared and submitted a 232 page Critical Habitat Petition to NOAA, requesting, *inter alia*, designation of critical habitat throughout the migratory corridor of the North Atlantic Right Whale, and the prohibition of offshore wind turbine construction within same. Such a request demonstrates a redoubtable interest in protecting marine mammals, not only east of LBI, but

throughout the migratory corridor of the North Atlantic Right Whale. This broader geographical concern for marine mammal protection directly affects Dr. Bob Stern, the president of Save Long Beach Island Inc. Dr. Stern personally observes whales and dolphins from the coast of LBI and derives aesthetic and recreational enjoyment therefrom. Empire Wind's impacts on the migratory corridor of the North Atlantic Right Whale farther north, and also the northern coastal migratory bottlenose dolphin (which propagates north and south in areas overlapping with the migration corridor of the North Atlantic Right Whale) will negatively impair Dr. Stern's ability to view dolphins and whales and derive aesthetic/recreational enjoyment therefrom. This is because disturbance, behavioral impacts, and death, to the North Atlantic Right Whale and northern coastal migratory bottlenose dolphin populations farther north in the Empire Wind region will invariably have negative impacts on observing these species near LBI. The Northern Coastal Migratory Bottlenose dolphin has a range from about Sandy Hook, NJ southward to Virginia.[2] Its inter-seasonal migration thus encompasses spatial domain from Sandy Hook, NJ to VA, and negative impacts to the Dolphin around Empire Wind's area will impair Dr. Stern's ability to derive recreational enjoyment from observing said dolphins off LBI, NJ.   Dr. Stern's present enjoyment and future concrete plans to observe these species east of LBI will be impeded due to Empire Wind. This is harm ascribed to Empire Wind would be favorably redressed by Court action. Thus, Plaintiff SAVE LONG BEACH ISLAND has been and is harmed by the NMFS action of ITA approval.

8.    Plaintiff ROBERT STERN PHD, is the president of Save Long Beach Island, Inc. Dr. Stern personally observes whales, very likely including humpbacks, North Atlantic right

---

[2] https://media.fisheries.noaa.gov/2021-07/f2020_AtlGmexSARs_NmigBottlenoseDolphin.pdf?null

whales, and dolphins, very likely including bottlenose dolphins (such as the northern coastal migratory bottlenose dolphin) from the coast of LBI and derives aesthetic and recreational enjoyment therefrom. On September 6th 2023, he departed for an excursion into the NJ/NY Bight, over the waters which include Empire Wind, in which he sought to observe whales and dolphins (including bottlenose dolphins, such as the northern coastal migratory bottlenose dolphin) in the waters of that region. Furthermore, he has plans for future excursions into the NJ/NY Bight for further whale watching and dolphin observations, in the areas including the construction of Empire Wind. Empire Wind's impacts on the migratory corridor of the North Atlantic Right Whale farther north, and also the northern coastal migratory bottlenose dolphin (which propagates north and south in areas overlapping with the migration corridor of the North Atlantic Right Whale) will negatively impair Dr. Stern's ability to view dolphins and whales and derive aesthetic/recreational enjoyment therefrom. This is because disturbance, behavioral impacts, and even death, to the North Atlantic Right Whale and northern coastal migratory bottlenose dolphin populations farther north in the Empire Wind region will invariably have negative impacts on observing these species near LBI. The Northern Coastal Migratory Bottlenose dolphin has a range from about Sandy Hook, NJ southward to Virginia.[3] Its inter-seasonal migration thus encompasses spatial domain from Sandy Hook, NJ to VA, and negative impacts to the Dolphin around Empire Wind's area will impair Dr. Stern's ability to derive recreational enjoyment from observing said dolphins off LBI, NJ. It will negatively impair Dr. Stern's ability to view, observe and enjoy the bottlenose dolphins, whales (including humpback and right whale) on future excursions in the NY Bight, including in the waters of the Empire Wind project. Dr. Stern's present enjoyment and future concrete plans to

---

[3] https://media.fisheries.noaa.gov/2021-07/f2020_AtlGmexSARs_NmigBottlenoseDolphin.pdf?null

observe these species east of LBI will be impeded due to Empire Wind activities, sanctioned by the NMFS. This is harm ascribed to Empire Wind, ultimately traced to the NMFS' MMPA ITA/LOA approval, would be favorably redressed by Court action. Plaintiff Stern is thus a person for whom the aesthetic and recreational values of the area is and will be lessened due to Empire Wind's offshore activities.

9.      Plaintiff SAVE THE EAST COAST, INC., is a 501(c)(4) nonprofit ocean environmental advocacy group based in New Jersey. Their mission is to protect the ocean and the diverse life it sustains, along with the coastal ecosystems and communities from the harms and costs of offshore wind and ocean industrialization.

10.     Plaintiff PROTECT OUR COAST – LINY is an organization formed to protect the environment in all of Long Island's coastal waters. They are committed to protecting every inch of Long Island's coasts, be it the ocean or the sound as well as the natural communities and neighborhoods that surround them. The group seeks to identify, and mitigate or avoid, any adverse impacts that could result from the transmission line cables, substation(s) and other infrastructure. The group also seeks to conserve the natural environments on land and in the sea; preserve natural habitats; protect human health and welfare; and, preserve the community character through orderly development. The group opposes the inappropriate industrialization of Long Island's remaining natural environment.

11.      Plaintiff CAPTAIN ALAN SHINN has fished the waters off the New Jersey Coast his entire life. He loved it so much that he started working on boats when he was only 11 years old. One could say he was born for this. His grandfather, David Shinn, started a fishing and charter boat business out of Belmar, NJ in 1936. His father took over the family business and he followed in his footsteps. He earned his captain's license when he was just 19 years old and has been safely

running boats ever since. All the legacy of Miss Belmar has taught him how to operate boats in a professional and safe manner and how to furnish his vessels for maximum comfort for his passengers. He currently owns and operates three vessels out of the Belmar Marina. With over 40 years' experience, very few can match the expertise that he has in running charters and navigating the coastal waters off the New Jersey Shore. He regularly brings fishing and whale and dolphin watching charters to the waters wherein Empire Wind will be constructed. These trips off the New Jersey coast include, but are not limited to, the very areas on which Empire Wind is constructing its offshore wind project. While on those trips, he (and his customers) regularly observes dolphins and whales in the waters in which Empire Wind will be constructed. They often observe humpback whales, sharks, rays, sea turtles, and bottlenose dolphins, which includes the Northern Coastal Migratory Bottlenose Dolphin at issue in this case.[4] They (Alan Shinn and his customers) enjoy the experience of observing all of these creatures and derive great aesthetic and recreational pleasure and value from experiencing the beauty of these creatures. Therefore, he is a person for whom the aesthetic and recreational values of the area are and will be lessened due to the allowance of the Empire Wind ITA (approved by the National Marine Fisheries Service) which will disturb whales and dolphins (including the northern coastal migratory bottlenose dolphin) negatively impacting and impairing his ability (and his customers' ability) to personally observe the dolphins and whales. This area is biologically rich and productive, teaming with fish, whales and dolphins and is economically important to Miss Belmar, Inc. He will be economically harmed via Empire Wind as his business (Miss Belmar) relies heavily upon tours of marine mammals in the Empire

---

[4] The primary bottlenose dolphin east of Monmouth County is the Northern Coastal Migratory Bottlenose Dolphin, the species at issue in this case. The offshore form of the bottlenose dolphin is found much, much farther offshore near the eastern edge of the continental shelf. https://conservewildlifenj.org/?species=tursiops-truncatus&utm_source=chatgpt.com

Wind area. Furthermore, he is a business owner for whom the economic and recreational values of the area is and will be lessened due to the allowance of the Empire Wind ITA which will disturb dolphins (including the northern coastal migratory bottlenose dolphin) negatively impacting and impairing his ability to bring passengers to observe the dolphins in this area which is a critical part of his business. Our season begins in May and ends in October and we focus our trips on when the whales and dolphins are present. Often, June-September is our peak season when we have the majority of our whale and dolphin trips. We run 2 trips per day, 7 days per week from the end of June until Labor Day. After Labor Day we run 6 trips a week until the end of October. We also do dolphin sunset cruises which can be 20 plus trips a week in the summer. So, our whale and dolphin watching business is mostly during the summer months, and if we cannot view dolphins during this time, it will destroy our whale and dolphin tour business. The period happens to be the very time many species are most active in our waters, including the Northern Migratory Coastal Bottlenose Dolphin.[5] And this is also when Empire Wind will be constructing the most (May through October). If the whales and dolphins continue to die off or alter their migration routes, that will destroy his ability to view these whales and dolphins, and destroy his business's ability to offer tours to look for them. If people cannot reliably see them on tours, they will not book the tours, and his business will suffer financially. He has noticed an increase in whale carcasses floating in the waters where he does business. When they encounter these dead whales on their trips, their customers become upset, which discourages them from returning for another tour, and

---

[5] Note that this species of Dolphin is most prevalent May-September in the waters east of NJ. This overlaps with Empire Wind's busiest pile driving period.  https://media.fisheries.noaa.gov/2021-07/f2020_AtlGmexSARs_NmigBottlenoseDolphin.pdf?null
"During aerial and ship surveys off the New Jersey coast in 2008 and 2009, no sightings of common bottlenose dolphins were made during November–February; bottlenose dolphins were sighted from early March to mid-October and were most abundant during May–August (Whitt et al. 2015)."

leads them to write negative reviews, further discouraging prospective customers. He anticipates that the more dead whales and dolphins he encounters, the fewer trips people will take, leading to a significant loss of business. People hire his company to take them to where marine animals are. Empire Wind is and will directly impair his company's ability to successfully do just that. Not only will he suffer economic harm to his business, Miss Belmar, Inc., but he will suffer personal harm as well. Miss Belmar is a family-run business for 99 years that has been passed down for 3 generations. His daughter, Alannah, is already following in his footsteps and has been learning the ropes of the family business since she was 10 years old. He is preparing to hand the Miss Belmar legacy over to her in the future, making it a 4th generation family business. Therefore, he will suffer aesthetic, recreational and economic harms (negatively affecting Miss Belmar business due to disturbed marine mammals in the Empire Wind area, attributable to the agency's approval of the Empire Wind ITA) and personal harm to his family and his family's legacy. This harm is traceable to the agency sanctioned Empire Wind activities, and a favorable Court decision will redress this harm.

12.    Plaintiff BOROUGH OF SEASIDE PARK, is a borough in Ocean County New Jersey, of which Plaintiff MAYOR JOHN PETERSON is the mayor. The BOROUGH OF SEASIDE PARK will be deleteriously affected by Empire Wind in a plethora of ways. The Empire Wind massive industrialization proposed in such close proximity to the New Jersey/New York coastline and the ocean environment will have irreparable and devastatingly negative upon their ocean, recreational and commercial fishing interesting, their marine environment, tourism industry, property values, and quality of life on the Jersey Shore. The reactivation of permits for the Empire Wind project is precedent setting and in no way is supported by independent, sound science. One only has to look at the calamitous effects of this last summer's breaking off of one

blade of a turbine off Nantucket, which occurred on a clear day. This is not supported economically or environmentally and potentially disruptive to air traffic and national defense. This unvetted industrialization of the ocean is outrageous from numerous perspectives, and the irreparable harm inevitably caused by allowing Empire Wind to proceed can never be reversed.

13.    Defendant NMFS is an agency of the federal government, within the United States Department of Commerce's National Oceanic and Atmospheric Administration. "NOAA Fisheries, also known as the National Marine Fisheries Service, is responsible for the management, conservation, and protection of living marine resources within about 200 miles of the U.S. coast."[6]

14.    Defendant EUGENIO PIÑEIRO SOLER is the director of the NMFS.

15.    Defendant HOWARD LUTNICK is the Secretary of the United States Department of Commerce.

16.    Defendant U.S. DEPARTMENT OF COMMERCE is an executive department of the U.S. federal government.

17.    Defendant BOEM is a federal agency within the U.S. Department of Interior, tasked with managing the "development of U.S. Outer Continental Shelf (OCS) energy, mineral, and geological resources in an environmentally and economically responsible way."[7]

18.    Defendant WALTER CRUICKSHANK is the Director of BOEM.

19.    Defendant U.S. Department of Interior is an executive department of the U.S. federal government responsible for the management and conservation of most federal lands and natural resources.

---

[6] https://www.usa.gov/agencies/noaa-fisheries#:~:text=NOAA%20Fisheries%2C%20also%20known%20as,miles%20of%20the%20U.S.%20coast.

[7] https://www.boem.gov/about-boem

20.     Defendant DOUG BURGUM is the Secretary of the Department of Interior.

## FIRST CAUSE OF ACTION

**[Violations of the Marine Mammal Protection Act and the Administrative Procedures Act]**

21.     Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

22.     This cause of action challenges significant legal deficiencies, in the MMPA Incidental Take Statement for Empire Wind.

23.     Pursuant to 16 USC 1373(a), the MMPA stipulates that, "the Secretary, on the basis of the best scientific evidence available and in consultation with the Marine Mammal Commission, shall prescribe such regulations with respect to the taking and importing of animals from each species of marine mammal . . ." The best scientific evidence available was not utilized in the agencies' analysis in the ITA.

24.     The primary purpose of the MMPA was to "establish a national policy to prevent marine mammal species and population stocks from declining beyond the point where they ceased to be significant functioning elements of the ecosystems of which they are a part."[8]

25.     The MMPA at 16 USC 1371(a) provides, "There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this chapter, during which time no permit may be issued for the taking of any marine mammal and no marine mammal or marine mammal product may be imported into the United States except in the following cases . . ."

---

[8] https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-protection-act-policies-guidance-and-regulations

26.    The MMPA permits an exception to this general proscription, "upon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary **shall allow**, during periods of not more than five consecutive years each, **the incidental**, but not intentional, **taking** by citizens while engaging in that activity within that region **of small numbers of marine mammals** of a species or population if the Secretary finds that the **total** of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock [emphasis added]." 16 USC 1371(a)(5)(A).

27.    As such, even within the exception, the MMPA countenances only the taking of 'small numbers' of marine mammals. "Take" within the meaning of the MMPA can mean Level A or Level B takes.

28.    Level A harassment is defined as, "has the potential to injure a marine mammal or marine mammal stock in the wild." 16 USCS § 1362(18)(A)(i), 50 CFR 216.3.

29.    Level B harassment is defined as, "has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 USCS § 1362(18)(A)(ii), 50 CFR 216.3.

30.    Empire Wind's approved Incidental Take Authorization[9] requests the take of an impermissibly high number of marine mammals, specifically the northern migratory coastal bottlenose dolphins.

---

[9] https://www.fisheries.noaa.gov/s3/2024-02/EmpireWind-2024LOA-OPR1.pdf

**Table 1 – Maximum Annual and 5-year Total Take Authorized For the Empire Wind Project Incidental to All Specified Activities**

| Common Name | Scientific Name | Stock | Maximum Annual Take | | 5-year Total Take | |
|---|---|---|---|---|---|---|
| | | | Level A Harassment | Level B Harassment | Level A Harassment | Level B Harassment |
| Atlantic white-sided dolphin | *Lagenorhynchus acutus* | Western North Atlantic | 0 | 747 | 0 | 1,840 |
| Bottlenose dolphin | *Tursiops truncatus* | Western North Atlantic - Offshore | 0 | 1,800 (pile driving only) | 0 | 2,565 (pile driving only) |
| | | Northern Migratory Coastal | 0 | 1,185 (pile driving only) | 0 | 1,455 (pile driving only) |
| | | Northern Migratory Coastal and Western North Atlantic - Offshore | 0 | 2,865 (HRG survey) | 0 | 8,730 |

31.    The ITA requests a maximum annual taking of 1,185 Bottlenose dolphins (Northern Migratory Coastal Stock) by way of Level B take. This take specified as occurring in connection with the pile driving phase of Empire Wind, which is scheduled to initiate in May 2025.

32.    The population of the Northern Migratory Coastal Bottlenose Dolphin stock is presently estimated at 6,639 as per NOAA Fisheries.[10]

33.    As such, 1185/6639 constitutes 17.9% of the population. However, the National Marine Fisheries Service ("NMFS") explains in the Empire Wind ITA that they anticipate 930 additional annual takes by way of high-resolution geophysical surveys ("HRG"). This yields a total annual taking of 31.9% of the Northern Migratory Coastal Bottlenose Dolphin stock. The

---

[10] https://media.fisheries.noaa.gov/2021-07/f2020_AtlGmexSARs_NmigBottlenoseDolphin.pdf?null

magnitude of this taking is explicitly conceded by the NMFS in the Empire Wind final ITA:

> "For purposes of this analysis, NMFS has conservatively assumed that every day during summer months (July and August; as identified in Hayes *et al.,* 2021) when it is most likely this stock could occur in the Project Area, one average group size per day could be taken by harassment incidental to HRG surveys. That is, harassment could occur to the coastal stock on approximately 62 days, noting these 62 days could be spread out over a longer time period ( *e.g.,* June through September) when waters are warm enough to host this stock. These assumptions equate to 930 takes ( *i.e.,* 62 days × 15 dolphins per day) from HRG surveys. Combined with the take authorized incidental to pile driving ( *i.e.,* 1,185 takes), the maximum total take authorized in a given year is 2,115. **If one assumes that all takes are of a different individual, this equates to 31.9 percent of the population [emphasis added].**"[11]

34.     Therefore, the authorized annual percentage take of the Northern Migratory Coastal Bottlenose Dolphin is 31.9%. The pile driving requested take alone of 17.9% is violative of the "small numbers" provision of the MMPA and the combined total annual take, including HRG surveying of 31.9% constitutes an even more egregious violation of the MMPA.

35.     An additional 270 Level B takes of the Northern Migratory Coastal Bottlenose Dolphin are authorized in the subsequent year, and as the ITA documents indicate, HRG surveys continue for the entire 5-year period.[12]  Conservatively presuming 50% of the year-1 930 HRG induced takes, yields 465 HRG takes for the subsequent 4 years. Thus, the total 5-year take is 4,245 Level B takes (1,455 total pile driving and 930 + 465 + 465 + 465 + 465 HRG takes) of 64% of the total population. This is an egregious violation of the MMPA small numbers provision and the negligible impact criteria (16 USC 1371(a)(5)(A)).

---

[11] https://www.federalregister.gov/documents/2024/02/14/2024-01363/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the

[12] https://www.federalregister.gov/documents/2024/02/14/2024-01363/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the

36.     It is the paragon of arbitrariness to presume that disturbance of two-thirds of the Northern Migratory Coastal Bottlenose Dolphin population will have a negligible impact on it. Level B disturbance of dolphin behavior can result in numerous undesirable outcomes, including, loss of navigational capacity and possible stranding, of communication between, for example, mothers and calves, potentially leading to the death of the calf; interference with their ability to detect prey, potentially leading to malnutrition or fatality, and their ability to detect predators; disruption, stress, and disorientation leading to heightened vulnerability to vessel strikes, potentially harm in the animal is ways not fully elucidated by current understanding. It is thus unreasonable and arbitrary to presume that no outcomes of Level A harm or fatality will occur to the dolphins from these numerous Level B disturbances. Consequently, a negligible impact finding is unsupportable and arbitrary.

37.     Jurisprudence has elucidated that "small numbers" cannot possibly constitute a proportion greater than 10.6% and certainly not as much as 12% (annually and over the project period).

38.     The NFMS is not entitled to deference regarding their small numbers interpretation, in view of the overturning of Chevron. Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024). As such, the Court must employ an independent assessment, which objectively, should yield a small numbers interpretation as described herein.

39.     Furthermore, even considering these highly violative requested takes, the actual number of Level A and B takes is very likely greater than indicated by the NMFS.

40.     There are various sources of noise underestimation, as pointed out in plaintiff SLBI's prior comments on the Atlantic Shores project EIS and ITA that used the same calculation methods including: a) use of a dubious, unproven auditory weighting function in lieu of a more

16

current scientifically sound function, b) improperly low noise source magnitude, c) improper reduction of noise source magnitude, and d) unexplained and very high noise transmission loss magnitudes.

41.    Furthermore, the data demonstrably indicates that a statistically significant increase in dolphin mortality events occurred coterminous with heightened offshore wind activity in the NY/NJ Bight. This correlation is statistically significant at the p-value alpha level of 0.01 (1%). The control group indicates that this statistically significant increase in dolphin mortalities cannot be explained by general vessel traffic.

42.    In view of the robust spatiotemporal correlation between offshore wind activity and materially increased dolphin deaths; the statistically significant correlation between offshore wind vessel activity and marine mammals absent any other etiology; and, the material underestimates of noise exposure on marine mammals, the NMFS arbitrarily and capriciously underestimated Level A and Level B takes of dolphins, including northern coastal migratory bottlenose dolphins.

43.    Moreover, beyond underestimates of takes, the NMFS engaged in arbitrary and capricious determinations through their failure to stratify impact to marine mammals as a function of the type of take (Level A or B) and listed status (endangered or not endangered). The scientifically reasonable approach adopted by Wood, Southall and Tollit[13] bifurcate the magnitude marine mammal impact into Level A and B, and endangered / unlisted. This impact categorization is the reasonable, scientifically sound approach as it acknowledges the heightened sensitivity of the endangered species (through use of the potential biological removal level) and degree of impact. See below figure:

---

[13] Wood, J., Southall, B.L. and Tollit, D.J. (2012) PG&E offshore 3-D Seismic Survey Project EIR – Marine Mammal Technical Draft Report. SMRU Ltd.  https://www.coastal.ca.gov/energy/seismic/mm-technical-report-EIR.pdf

Table 3.3 Descriptions of the levels within four intensity components used to rate severity

*Geographical Extent:*

| State-wide | Effects extend outside regional boundary, but within state setting. |
|---|---|
| Regional | Effects likely to extend outside of project boundary to regional setting. |
| Local | Effects likely to be limited within project boundary. |

*Magnitude (Mortality/Injury/Level 'A' take):*

| High | >100% of stock population residual PBR affected |
|---|---|
| Moderate | 50-100% of stock population residual PBR affected |
| Low | 10-50% of stock population residual PBR affected |
| Negligible | <10% of stock population residual PBR affected |

*Magnitude (Disturbance/Level 'B' take):*

| High | >25% of regional non-listed species minimum population / >2.5% ESA-listed regional minimum population |
|---|---|
| Moderate | 15-25% of regional non-listed species minimum population / 1.25-2.5% of ESA-listed regional minimum population |
| Low | 5-15% of regional non-listed species minimum population / 1 ESA-listed animal and <1.25% of ESA listed minimum population |
| Negligible | <5% of regional minimum population / <1 ESA listed animal |

*Duration:*

| Long-term | refers to more permanent effects that may last for more than 3 months (a season) to years and from which the affected animals or resource never revert back to a "normal" condition |
|---|---|
| Moderate-term | refers to a temporary effect that lasts 1 to 3 months and the affected animals or resource may revert back to a "normal" condition. |
| Short-term | refers to a temporary effect that lasts from days to one month and the affected animals or resource revert back to a "normal" condition. |

Frequency:

| Continuous | Effects continuous. |
|---|---|
| Intermittent | Effects intermittent, but repeated. |
| Isolated | Effects confined to one or two periods. |

Intensity component levels, once established, were used to determine a severity rating using a matrix approach depicted below in Table 3.4. Severity ratings were described as High, Medium, Low or Negligible.

44.     As such, based upon that well-established scientific research, the NMFS authorized a "high" magnitude (greater than 25% of population) of Level B take for the northern coastal migratory bottlenose dolphin. The NMFS failure to use the Southall approach which appreciates the true magnitude of impact to marine mammals is arbitrary and capricious.

45.     Finally, the agency's assertion that one-third of a particular marine mammal population complies with the small numbers provision of the MMPA is arbitrary and capricious.

46.     As such, the determinations of NMFS with its MMPA final rule (Incidental Take Authorization), violate the MMPA and APA (including, but not limited to, APA subsections, 5 U.S.C. §706(2)(A), (C), (E)) for the aforesaid reasons. And as such, Plaintiffs, Robert Stern PHD, Save Long Beach Island, and Captain Alan Shinn have been harmed through violation of MMPA and APA.

## SECOND CAUSE OF ACTION

## [Violations of the National Environmental Policy Act and the Administrative Procedures Act]

47.     Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

48.     Plaintiff Save Long Beach Island, Inc., participated in the administrative process by submitting a public comment on the New York Bight programmatic EIS, related to Empire Wind's environmental impacts.[14]

---

[14]Document (BOEM-2021-0033-0001):  https://www.regulations.gov/comment/BOEM-2021-0033-0054

49.    Pursuant to NEPA, 42 USCS § 4332(2)(C), and as interpreted by case precedent, "In deciding whether a major federal action will 'significantly' affect the quality of the human environment, under § 102(2)(C) of the National Environmental Policy Act, the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area."[15]

50.    Moreover, in NEPA 42 USCS § 4332(H), it stipulates that all agencies shall, "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

51.    Further, in 42 USCS § 4332(F), NEPA demands [that agencies] "consistent with the provisions of this chapter, study, develop, and describe technically and economically feasible alternatives."

52.    NEPA also requires, in 42 USCS § 4332(C)(iii), for major federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on, "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal."

---

[15] Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972).

53.    BOEM concedes, in the Final Environmental Impact Statement for Empire Offshore Wind, that this the undertaking of Empire Wind is indeed a "major federal action" within the meaning of NEPA.[16]

54.    Pursuant to Council on Environmental Quality ("CEQ") regulations at 40 CFR §1502.14(a), agencies shall, "**Rigorously explore and objectively evaluate** reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination. The agency need not consider every conceivable alternative to a proposed action; rather, it shall consider a reasonable range of alternatives that will foster informed decision making [emphasis added]." And in subsection (b), "(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits."

55.    BOEM abdicated its duty to "rigorously explore and objectively evaluate" the reasonable alternatives, including the no action alternative throughout its entire decision-making process. In the project FEIS, it offers minor alterations of the proposal as "alternatives" but these are not real alternatives in the NEPA sense because their environmental impact is the same. It offers a legally inadequate explanation for elimination of alternatives (including the no action alternative), lack of objective evaluation, and inadequate consideration of cumulative impacts.

56.    Prior to the EIS at the most environmentally impacting lease area award decision, the BOEM did not provide any EIS review of alternative lease areas and projects, promising such, but deferring its review to the project decision. But subsequent to that, it altered its policy and recommended no consideration of alternative areas or projects in the project EIS. Consequently,

---

[16] https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Empire_Wind_FEIS_Vol1_0.pdf

at no point in its entire decision-making process has the BOEM offered the public an alternative EIS review of the environmentally significant factors such as project location, turbine number, turbine power and gear drive. Its approach has in fact been directly counter to the alternative requirements of the NEPA cited above.

57. Moreover, BOEM stated in the FEIS Volume 1, "Under the No Action Alternative, the environmental and socioeconomic impacts and benefits of the action alternatives would not occur." Under 40 CFR §1502.14(a), BOEM failed to comply with the stipulation to "foster informed decision making" by arbitrarily overstating the benefits of the alternatives and arbitrarily understating the benefits of the no action alternative.[17] BOEM erroneously predicates its rejection of the no action alternative on the following: "The No Action Alternative was not selected in this ROD because it would not allow for the development of DOI-managed resources and would not meet the purpose and need." But this is vague and the FEIS stated no substantive purpose and need for the project to compare to, only the stated need for BOEM to approve or disapprove it. Therefore, no rigorous exploration or objective evaluation of the no action alternative was ever conducted, which is antithetical to the raison d'être of NEPA, and thus arbitrary and capricious.

58. Finally, not only did BOEM fail to adequately analyze alternatives objectives such

---

[17] BOEM, in its ROD of Empire Wind, erroneously concludes that the no action alternative will lead to long term adverse impacts. *"Nonetheless, the No Action Alternative would likely result in moderate, long-term, adverse impacts on regional air quality because other energy generation facilities would be needed to meet future power demands. These facilities might be fueled with natural gas, oil, or coal, which would emit more pollutants than wind turbines and would have more adverse impacts on air quality and contribute greenhouse gases that cause climatic change. Adverse impacts on air quality also tend to disproportionally impact environmental justice communities, which often include low-income and minority populations. These air quality impacts might be compounded by other impacts because selection of the No Action Alternative could negatively impact future investment in U.S. offshore wind energy facilities, which in turn could result in the loss of beneficial cumulative impacts, such as increased employment . . ."* https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Empire%20Wind%20OCA-A%200512%20ROD%20signed.pdf

that stakeholders can make informed decision(s), it failed to undertake a sufficient cumulative analysis of the environmental, ecological, oceanic impacts of the agency action (approving Empire Wind) and the impacts of other adjacent proposed and existing offshore wind projects in the New York Bight.

59.    In October 2022, BOEM and NOAA issued a draft document titled BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy (the "NARW and OSW Strategy"),[18] which admits that BOEM's Atlantic OSW program, when viewed in its entirety, has the potential to harm NARW and cause population scale impacts to the species. Key statements from the NARW and OSW Strategy include the following:

- "In March 2021, in response to Executive Order 14008, Tackling the Climate Crisis at Home and Abroad, the Departments of Interior, Energy, and Commerce announced a national goal to deploy 30 gigawatts of OSW by 2030, while protecting biodiversity and promoting ocean co-use." (p. 1.)

- "BOEM and the National Oceanic and Atmospheric Administration's (NOAA's) National Marine Fisheries Service (NOAA Fisheries) recognize [OSW] development (from siting to decommissioning) must be undertaken responsibly including managing and mitigating the impacts to endangered species like the North Atlantic right whale. The NARW population is currently in decline, mainly due to vessel strikes and entanglement in fishing gear, necessitating precaution to ensure

---

[18]

https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf

that OSW development is carried out in a way that minimizes the potential for adverse effects to the species and the ecosystems on which it depends." (p. 1.)

- "The agencies are working to understand the effects of OSW development on NARWs and their ecosystem, and to develop strategies to mitigate and monitor impacts to NARWs from OSW development."

- "BOEM and NOAA Fisheries initiated development of this shared draft North Atlantic Right Whale and Offshore Wind Strategy (hereinafter called "Strategy") to focus and integrate past, present, and future efforts related to NARW and OSW development. In response to Executive Order 14008, both agencies share a common vision to protect and promote the recovery of North Atlantic right whales while responsibly developing offshore wind energy. This vision reflects the combined legislative mandates of the two agencies and commitment to the Administration's goal of developing OSW while protecting biodiversity and promoting ocean co-use." (pp. 1-2.)

- "As of September 2022, there were 27 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS) and there are 42 megawatts of installed OSW capacity. The OCS is the area of the continental shelf that begins at the edge of state marine boundaries (typically 3 nautical miles offshore except 9 miles for Texas and the west coast of Florida) and extends to 200 nautical miles, and more in some places." (p. 3.)

- "Additional lease sales are expected to be held in the Gulf of Maine and the Central Atlantic. In total, the area in existing leases and being considered for leasing in

planning areas in the Atlantic OCS covers 22.237 million acres (about 8% of the Atlantic OCS). The OSW infrastructure currently proposed for installation by 2030 would be located on about 2.349 million acres, use fixed turbine technologies, and include 3,441 turbines and foundations and 9,874 miles of export and inter-array submarine cables." (p. 3.)

- "In addition, the Biden-Harris Administration has announced the goal of 15 gigawatts of floating OSW capacity by 2035. These metrics of development will change over time; but for purposes of this Strategy, the metrics demonstrate the large-scale nature of the development planned and underway." (p. 3.)

- "Due to the declining status of NARWs, the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction, and the population is small enough that the death of even some individuals can have a measurable effect on its population status, trend, and population dynamics. Further, the loss of even one individual a year may reduce the likelihood of recovery and the species achieving optimum sustainable population." (pp. 6-7.)

- "NOAA Fisheries' North Atlantic Right Whale Priority Action Plan for 2021-2025 identifies the need to improve our knowledge of factors that may limit NARW recovery, such as OSW development (NOAA Fisheries 2021)." (p. 7.)

- "NARWs engage in migration, foraging, socializing, reproductive, calving, and resting behaviors critical to their survival (Leiter et al. 2017; Muirhead et al. 2018; Quintana-Rizzo et al. 2021; Zoidis et al 2021). The overlap between OSW

development (planned, leased, and permitted) and NARW habitat extends to corridors outside the immediate development sites, where vessel traffic between ports and offshore sites would further overlap with the distribution of NARW." (p. 7.)

- "Effects to NARWs could result from exposure to a single project and may be compounded by exposure to multiple projects. It is important to recognize that NARW migrating along the U.S. Atlantic Coast travel through or nearby every proposed OSW development." (p. 11 [Emphasis added].)

60.     The EIS must provide an accurate presentation of key facts and environmental impacts, as this is "necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA."  Natural Resources Defense Council v. U.S. Forest Serv., 421 F.3d 797, 812 (9th Cir. 2005).  An EIS that is incomplete or provides misleading information can "impair[] the agency's consideration of the adverse environmental effects and . . . skew . . . the public's evaluation of the proposed agency action."  Id., at 811.  For this reason, erroneous factual assumptions and misrepresentations of important facts can fatally undermine the information value of the EIS to the public and decision-makers.  Id., at 808.

61.     An EIS must provide a detailed statement of: (1) the environmental impacts of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitment of resources that would be involved in the action should it be implemented.  42 U.S.C. § 4332(C).  An EIS must "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize

adverse impacts or enhance the quality of the human environment." 40 CFR § 1502.1. NEPA also requires federal agencies, such as BOEM, to analyze the direct, indirect, and cumulative impacts of the proposed action and to take a hard look at those impacts. 40 CFR §§ 1508.7, 1508.8. In addition, NEPA requires federal agencies to consider mitigation measures to minimize the environmental impacts of a proposed action. 40 CFR § 1502.14 (alternatives and mitigation measures); 40 CFR § 1502.16 (environmental consequences and mitigation measures).

62.    The final EIS failed to provide impact information essential to make any reasoned decision on project approval or disapproval, including that on the impact of underwater noise from operation of all the large turbines in this project and others to impair or block marine mammal migration, the feasibility and impact of , turbine removal and onshore processing, the extremely long term impact on vessel navigation safety if the turbines are not removed, the impact on onshore air defense radars at Riverhead NY, the geologic stability of the site (earthquake fault analysis; potential instability due to underground aquifers) onshore airborne noise from pile driving and turbine operation, on the right whale's food source (copepods) and the humpback whale's food source (menhaden), the cause of the recent whale and dolphin deaths, onshore and ocean contamination from turbine component failures and consequences from normal operation and windstorms, the project's effect on climate change and sea level rise, greenhouse house gas emission changes on a regional (transmission grid) scale, protection of now submerged ancient archeologic artifacts, and business job and revenue losses from higher electric rates.

63.    The term "affected environment" is expounded in the NEPA regulations at 40 CFR § 1502.15, which outlines the requirements for describing the environment that may be impacted by a proposed federal action in an EIS. "**(a)** The environmental impact statement shall succinctly describe the environment of the area(s) to be affected by the alternatives under consideration,

including the reasonably foreseeable environmental trends and planned actions in the area(s)." 40

CFR § 1502.15.

64.    The agency is actively engaged in planned offshore wind project actions within the

whale's primary migration corridor. That corridor was shown in the draft NARW strategy

document and more precisely defined in the Save LBI petition of March 31, 2025 to NOAA to

designate it as critical habitat. The corridor and planned wind project actions within it are shown

below.



65.    Such wind development projects are reasonably foreseeable trends and planned actions within the affected migration areas. The final EIS should have included the impact on the whale's migration, particularly from operational turbine noise from those other projects in the affected environment section, so that the impact of the proposed action could be added to that to determine the only meaningful impact, which is the impact on its full migration. By failing to do so, it was gravely deficient regarding a highly significant impact that was "necessary to ensure a well-informed and reasoned decision." Natural Resources Defense Council v. U.S. Forest Serv., 421 F.3d 797, 812 (9th Cir. 2005).

66.    For each of the reasons set forth above, BOEM's adoption of the ROD and Final EIS for Empire Wind project was arbitrary, capricious, and not in accordance with law as required by NEPA, its implementing regulations, and the APA (including, but not limited to, APA subsections, 5 U.S.C. §706(2)(A), (C), (E)). And as such, Plaintiffs Robert Stern PHD, Save Long Beach Island, and Captain Alan Shinn have been harmed through violation of NEPA.

## THIRD CAUSE OF ACTION

## [Violations Of The Outer Continental Shelf Lands Act (OCSLA)—43 U.S.C. §§ 1331, Et Seq. and Administrative Procedures Act]

67.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

68.    Plaintiffs' OCSLA-based claim is pursued exclusively through the APA, not OCSLA's citizen suit provision, as it challenges BOEM's unlawful agency action, namely, its

approval of Empire Wind is arbitrary and capricious, contrary to law, in excess of authority, and unsupported by substantial evidence, for the reasons set forth below (including, but not limited to, APA subsections, 5 U.S.C. §706(2)(A), (C), (E)).

69.    The following OCLSA subsections (including but not limited to), 43 U.S.C. § 1337(p)(4)(A), (B), (D), (F), (I), and (J) are relevant and directly applicable to the case at bar. Those subsections require the Secretary to "ensure that any activity under this subsection is carried out in a manner that provides for . . . (A) safety . . . (F) protection of national security interests of the United States . . . (I) Prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas . . . (J)(ii) consideration of any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation."

70.    Additionally, the OCLSA implementing regulations at 30 CFR § 585.437(b)(3) provide for the cancellation of a lease when "Required by national security or defense."

71.    BOEM's approval of Empire Wind was and is arbitrary and capricious because the agency abdicated its duty to ensure that the aforesaid statutory criteria are satisfied. But the approval of Empire Wind raises direct, substantial issues regarding interference with radar usage, navigation, and in turn, national security.

72.    BOEM itself commissioned a study in 2020 entitled, "Radar Interference Analysis for Renewable Energy Facilities on the Atlantic Outer Continental Shelf." OCS Study, BOEM 2020-039.

73.    The study concluded that Empire Wind would interfere with 13 disparate radar systems, and as such, classified Empire Wind's impact as "high" which is more severe than any other offshore wind project study. See the below table:

| Table ES-2. Radar Systems within LOS of Modeled Wind Farms | | | | | |
|---|---|---|---|---|---|
| | Number of Radar Systems within LOS | | | | |
| Wind Farm | ARSR-4 | ASR-8/9 | NEXRAD | SeaSonde | Totals |
| Skipjack | 0 | 1 | 1 | 5 | 7 |
| South Fork | 0 | 1 | 0 | 8 | 9 |
| Grand Strand | 0 | 0 | 0 | 2 | 2 |
| Mayflower | 0 | 2 | 0 | 6 | 8 |
| Vineyard Wind | 0 | 2 | 0 | 6 | 8 |
| Bay State Wind | 0 | 3 | 0 | 7 | 10 |
| Ocean Wind | 1 | 1 | 0 | 9 | 11 |
| Empire Wind | 1 | 2 | 2 | 8 | 13 |
| RI/MA Cumulative | 0 | 3 | 0 | 10 | 13 |

74.    The key findings included, "The research team found that the proposed and hypothetical wind farms are within Line of Sight (LOS) of 36 radar systems, indicating that they will generate interference to these radars under normal atmospheric conditions (Table ES-2). The radar type with the most radars affected was the SeaSonde, which reflects the large number of SeaSondes along the Atlantic coast. The research team also qualitatively ranked the severity of impacts caused by each wind farm. Skipjack, South Fork, and Grand Strand were found to have low radar impacts (color coded green in the table below). Mayflower, Vineyard Wind, Bay State Wind, and Ocean Wind were found to have moderate impacts (color coded yellow), and Empire Wind was found to have higher impacts (color coded red)."

75.    Yet, these critical findings were not analyzed in the Final EIS of Empire Wind.

76.    The final EIS did not disclose the gravity of the impairment of the Riverhead ARSR-4 radars by the project. It merely provides, "A review of radar line of sight found that the proposed WTGs at a maximum height of 951 feet (290 meters) could be either partially or fully

within the line of sight of the following six radar systems."[19] This is a gross understatement of the matter.

77.     The BOEM 2020 study notes, "Empire Wind is located close enough to the ARSR that nearly all turbines have at least some part visible to the radar (Figure 138). This creates a large region that will be affected by false targets and reduced detection probability for aerial radar targets."[20]

78.     It further states, "Figure 139 and Figure 140 show the signal to interference level of a small (0 dBsm, e.g., Cessna), lowflying (2,000 m) aircraft above the Empire Wind farm. For an aircraft at that altitude, over the wind farm the elevation of the target from the radar will be ~1.4°. The two plots show that for the two elevation beams that will contain the target that over the wind farm the target return does not rise above the threshold for a detection (13 dB) and does not for any other beams present so this low flying target would be lost over the wind farm." Id. at 99.

79.     Moreover, "Figure 146 shows the declared targets of the ARSR with a 3° beam as well as false targets which appear over the entire wind farm. This can allow aircraft to hide within these false targets, making detection of an aircraft difficult while over the wind farm." Id. at 103.

80.     "The small aircraft is lost due to a degraded detection from the turbines." Id. at 103.

81.     Figure 148 shows, for a larger target over the wind farm, that while that target could be seen, "there are many false targets which also exist and can potentially make distinguishing the larger aircraft difficult for an operator." Id. at 103.

---

[19] https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Empire_Wind_FEIS_Vol1_0.pdf

[20] https://www.boem.gov/sites/default/files/documents/environment/Radar-Interference-Atlantic-Offshore-Wind_0.pdf  at 98.

82.    This presents a serious impairment of the ARSR-4 radar to detect unwanted objects. The final EIS should have disclosed this to the public and stated whether and what specific mitigation measures can and will be employed to remove these obstacles and keep the air defense radars functional.

83.    The Record of Decision (Appendix Section 4.2.1, page A-37) requires a mitigation agreement between the developer and DOD/NORAD but does not specify when the agreement must be executed, the requirements, and the feasibility of efficacy of same. The mitigation agreement should have been in place prior to the ROD.

84.    The OCLSA implementing regulations at 30 CFR § 585.102 provide for the "Protection of national security interests of the United States." And the regulations further provide that a suspension may issue "(b) When the suspension is necessary for reasons of national security or defense." 30 CFR § 585.417. These regulations have both been violated.

85.    Recently, the acting Solicitor withdrew[21] Solicitor's Opinion M-37067 and reinstated M-Opinion 37059, which ensures that the Secretary err on the side of ensuring less interference with reasonable uses.[22] These reasonable uses include that which Plaintiff Captain Shinn engages in, including but not limited to commercial fishing, sportfishing, recreational activities, boating/shipping, etc. As such, Plaintiff Shinn has been harmed.

86.    As explained by the Acting Solicitor, "The Anderson Opinion's assertion that 'subsection 8(p)(4) commands only that the Secretary rationally balance the subsection's various goals" both diminishes the importance of each subparagraph (contrast "mandatory" with "goals"),

---

[21] https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf
[22] "(4) Requirements. The Secretary [of the Interior] shall ensure that any activity under this subsection is carried out in a manner that provides for— . . . (I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas[.]" § 1337(p)(4).

while also opening the door to the possibility that any one criterion may be favored over another. This no longer reflects the best, or even a permissible, agency interpretation. It must therefore be withdrawn.'" However, the Empire Wind Project was sanctioned under the erroneous interpretation of subsection 8(p)(4), a construction that simply cannot be reconciled with the best, proper interpretation of that provision, namely one that gives meaning and value to each individual criterion.[23] Thus, Empire Wind's approvals should be forthwith rescinded and reexamined under the proper subsection 8(p)(4) framework. BOEM's disregard of the requirements of OCSLA for offshore wind approval is arbitrary, capricious, and otherwise not in accordance with law.

87.    BOEM has arbitrarily and capriciously approved the project under OCSLA by abdicating its duty to ensure the prevention of pollution, discharges, or otherwise, which can degrade the marine environment.

88.    Pursuant to OCSLA regulations, at 30 CFR 585.105, it provides: "(a) Design your projects and conduct all activities in a manner that ensures safety and will not cause undue harm or damage to natural resources, including their physical, atmospheric, and biological components to the extent practicable; and take measures to prevent unauthorized discharge of pollutants including marine trash and debris into the offshore environment."

89.    There is no evidence in the BiOp, EIS documents, LOA, or elsewhere that the

---

[23] See Empire Wind Record of Decision, where BOEM states, "The Secretary's authorization must comply with OCSLA subsection 8(p)(4) (43 USC § 1337(p)(4)), which 'imposes a general duty on the Secretary to act in a manner providing for the subsection's [various policy] goals.' According to M-Opinion 37067, "[t]he subsection does not require the Secretary to ensure that the goals are achieved to a particular degree, and she retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension." **But this Opinion, M-37067, was abrogated, rendering its operational force null and void. Thus, Empire Wind's approval was predicated upon an erroneous interpretation of OCSLA.** https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Empire%20Wind%20OCA-A%200512%20ROD%20signed.pdf

Secretary has directed the applicant or otherwise taken such steps necessary to obviate the above from eventuating, for example, the recent blade failure event(s) attendant Vineyard Wind 1, and the multiplicity of examples globally of recurring blade failure events. In fact, there does not appear to be a blade failure event plan even contained in the Construction and Operations Plan.

90.    All in all, BOEM arbitrarily and capriciously approved Empire Wind;  the approval contravenes the aforesaid OCSLA provisions. The Secretary was without legal authority in approving the Project. The available evidence evinces that the Secretary failed to ensure that Empire Wind would be carried out in a manner that provides for safety; protection of national security interests of the United States; prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas; and, consideration of any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation.

91.    Plaintiff CAPTAIN ALAN SHINN has been harmed and falls squarely within the zone of interests of OCSLA, as the BOEM approved Empire Wind is and will interfere with his recreational, economic and navigational interests in the affected waters of Empire Wind. Plaintiff Shinn's ability to observe dolphins and whales (and derive aesthetic value therefrom) and capacity to bring customers on tours through the Empire Wind spatial area will be substantially impaired by the BOEM and NMFS approved Empire Wind. This will also harm Plaintiff Shinn economically as his use of the ocean through his tours will be deleteriously affected, and thus his ability to derive income from such tours, will be impacted. As such, Plaintiff Shinn's harm is directly traceable to the agency action of Empire Wind approval, and such harm is redressable by this Court (violations including, but not limited to, APA subsections, 5 U.S.C. §706(2)(A), (C), (E)).

**Prayer for Relief**

92.     Plaintiffs ask the Court for the following relief:

93.     An order holding unlawful, vacating, and setting aside Defendants' February 2024, decision approving the Construction and Operations Plan for the Empire Wind Project, as arbitrary, capricious, and otherwise not in accordance with law;

94.     An order holding unlawful, vacating, and setting aside Defendants' Nov. 21, 2023, decision approving the Empire Wind Record of Decision as arbitrary, capricious, and otherwise not in accordance with the law;

95.     An order holding unlawful, vacating and setting aside Defendants' MMPA Incidental Take Authorization;

96.     Reasonable attorneys' fees and costs for bringing this suit; and,

97.     Such other and further relief as the Court deems appropriate.


Dated: July 11, 2025

Respectfully submitted,

*/s/ Thomas Stavola Jr. Esq.*
Thomas Stavola Jr. Esq.
*Counsel for Plaintiffs*
DC Bar ID number: 90015331
Law Office of Thomas Stavola Jr. LLC
209 County Road 537
Colts Neck, NJ 07722
tstavolajr@stavolalaw.com
732-539-7244