UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAVE LONG BEACH ISLAND, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,<br><br>*Defendants*,<br><br>&<br><br>EMPIRE OFFSHORE WIND LLC, *et al.*,<br><br>*Defendant-Intervenors.* | Civil Action No. 1:25-cv-02214 (CJN) |

**MEMORANDUM OPINION**

Opponents of an offshore wind farm already under construction off the coast of New York and New Jersey move to enjoin further work on the ground that governmental authorizations for the project violate the Marine Mammal Protection Act. *See* ECF 17; 16 U.S.C. § 1371(a)(5)(A). For the reasons that follow, the Court denies their motion.

## I. BACKGROUND

**A.  Factual Background**

In early 2017, the Bureau of Ocean Energy Management (BOEM) issued a lease permitting the construction of an offshore wind farm near Brooklyn, New York. ECF 19-1 at 3. Equinor Wind US LLC initially won the rights to the lease and then later assigned those rights to its subsidiaries Empire Offshore Wind LLC and Empire Leaseholder LLC (collectively, Empire Wind). *Id.* The project covers nearly 80,000 acres and is projected to generate 2,076 megawatts

1

of electricity. ECF 21 at 5. Construction is proceeding in two phases: Empire Wind 1 and Empire Wind 2. ECF 19-1 at 3.

Leading up to the start of construction, Empire Wind applied for and received several permits at the federal and state level. In January 2020, Empire Wind submitted a Construction and Operations Plan to BOEM. *Id.* at 5. Its proposal included hundreds of mitigation and monitoring measures intended to minimize disruptions to the environment and animals caused by the project. *Id.* at 6. In February 2024, BOEM approved the Plan after several rounds of modifications and an environmental review. *Id.* at 5–6. In December 2024, BOEM reissued its approval of the Plan as two separate approvals: one for Empire Wind 1 and one for Empire Wind 2. *Id.* at 6.

In December 2021, Empire Wind requested a five-year Letter of Authorization from the National Marine Fisheries Service (NMFS) to "take" various marine mammals incidental to construction of the project in compliance with the Marine Mammal Protection Act. *Id.* at 4. That Act permits NMFS to authorize the taking of "small numbers of marine mammals of a species or population stock if the Secretary, after notice . . . and opportunity for public comment . . . finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock and will not have an unmitigable adverse impact on the availability of such species or stock for taking for subsistence uses." 16 U.S.C. § 1371(a)(5)(A)(i). "The term 'take' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal," *id.* at § 1362(13), and the Marine Mammal Protection Act distinguishes between two levels of harassment takings. Level A harassment encompasses "any act of pursuit, torment, or annoyance which . . . has the potential to injure a marine mammal or marine mammal stock in the wild." *Id.* § 1362(18)(A)(i), (C). Level B harassment covers "any act of pursuit, torment, or

annoyance which . . . has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns." *Id.* § 1362(18)(A)(ii), (D).

Following a round of notice and comment and an environmental review, in February 2024, NMFS issued a Letter of Authorization for the project that permits the incidental taking of marine mammals from February 2024 through February 2029. ECF 19-1 at 5. Of particular relevance here, the Letter authorizes annual Level B harassment of up to 31.9 percent of Northern Migratory Coastal Bottlenose Dolphins. *See* Taking Marine Mammals Incidental to the Empire Wind Project, Offshore New York, 89 Fed. Reg. 11342, 11416 (Feb. 14, 2024). Among other mitigation measures, the Letter of Authorization imposes a seasonal moratorium on impact pile driving, requires the use of species observers and sound attenuation devices during pile driving, and calls for shutdowns of pile driving if marine mammals were observed nearby. ECF 19-1 at 4–5. In January 2025, NMFS reissued the Letter with minor changes, including updating the relevant subsidiary that had permission to build the project. *Id.* at 5.

Active construction of Empire Wind 1 has been underway for more than a year. ECF 19-2 at 3. Construction of the onshore portion began in April 2024. *Id.* In-water installation of export cables to transfer electricity commenced in July 2024. *Id.* at 4. Building of monopile foundations for the wind turbines started in June 2025 and is scheduled to finish by the end of October 2025. *Id.* All construction for Empire Wind 1 is set to conclude by the end of 2026. *Id.* at 6.

On April 16, 2025, BOEM issued a suspension order that paused construction as part of the Department of Interior's general review of offshore wind projects, and on May 19, 2025,

BOEM lifted the suspension order. ECF 17-1 at 3. Empire Wind resumed construction the next day. *Id.* at 1.

**B.     Procedural History**

On April 4, 2023, Save Long Beach Island and Dr. Robert Stern filed a lawsuit in the District of New Jersey challenging authorizations issued by NMFS that permitted the incidental takings of marine mammals for several offshore wind projects. Complaint at 1–4, *Save Long Beach Island v. U.S. Dep't of Com.*, No. 3:23-cv-01886 (D.N.J. Apr. 4, 2023). On February 29, 2024, the district court dismissed the suit without prejudice for mootness and lack of standing. *See Save Long Beach Island v. U.S. Dep't of Com.*, 721 F. Supp. 3d 317, 335, 340 (D.N.J. 2024). Save Long Beach Island and Stern then filed an amended complaint on March 29, 2024, that explicitly challenged the Letter of Authorization for both Empire Wind 1 and 2. Amended Complaint at 15, *Save Long Beach Island v. U.S. Dep't of Com.*, No. 3:23-cv-01886 (D.N.J. Mar. 29, 2024). But, on June 11, 2025, the district court granted summary judgment to Empire Wind and the government regarding the Letter of Authorization. *See Save Long Beach Island v. U.S. Dep't of Com.*, No. 3:23-cv-01886, 2025 WL 1829543, at *31 (D.N.J. July 2, 2025).

On July 11, 2025, Save Long Beach Island and Stern—along with new Plaintiffs Save the East Coast, Inc., Protect Our Coast – LINY, Captain Alan Shinn, and Borough of Seaside Park— filed this suit against various government defendants, alleging that both the Letter of Authorization and the Construction and Operations Plan for Empire Wind 1 and 2 violate the Marine Mammal Protection Act, as well as the National Environmental Policy Act and the Outer Continental Shelf

4

Lands Act. ECF 1 at 2–3. Empire Wind intervened as a defendant. *See* Min. Order of Aug. 8, 2025.

On August 21, 2025, Plaintiffs moved for the Court to stay the effect of the Letter of Authorization and Construction and Operations Plan or, in the alternative, to enter a preliminary injunction to halt all Empire Wind 1 construction. ECF 17. In their motion, they raise only their claim under the Marine Mammal Protection Act, arguing that the government's approval of work on Empire Wind 1 exceeds that statute's allowance of takings of "small numbers of marine mammals of a species or population stock" because it permits Level B harassment of 31.9 percent of the Northern Migratory Coastal Bottlenose Dolphin stock. 16 U.S.C. § 1371(a)(5)(A).

## II.   ANALYSIS

### A.   Legal Standard

As a threshold matter, the Parties dispute whether the same standard applies for evaluating Plaintiffs' request for a stay versus a preliminary injunction. Plaintiffs contend that the standard for granting a stay under the Administrative Procedure Act, 5 U.S.C. § 705, overlaps with—but is distinct from—the standard for granting a preliminary injunction under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). ECF 17-1 at 3–5; ECF 22 at 2–4. Citing the Court of Appeals's decision in *Cuomo v. United States Nuclear Regulatory Commission*, they argue that "[t]o justify the granting of a stay, a movant need not always establish a high probability of success on the merits" and that "[a] stay may be granted with either a high probability of success and some injury, or *vice versa*." 772 F.2d 972, 974 (D.C. Cir. 1985). The government and Empire Wind respond that a request for such a stay must meet the same high bar as required for a preliminary injunction. ECF 19 at 12–13; ECF 21 at 10–11. They argue that because the same standard applies, "the Court may deny a motion for preliminary injunction [or a stay], without

5

further inquiry, upon finding that a plaintiff is unable to show *either* irreparable injury or a likelihood of success on the merits." ECF 19 at 13 (quoting *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016)).

Decisions predating and postdating *Cuomo* confirm that a plaintiff seeking a stay under 5 U.S.C § 705 must demonstrate that it will suffer irreparable harm absent a stay, just as a party seeking a preliminary injunction must demonstrate that it will suffer irreparable harm absent such relief. For example, in *Wisconsin Gas Co. v. FERC*—decided a few months before *Cuomo*—the Court of Appeals "address[ed] only whether the petitioners have demonstrated that in the absence of a stay, they will suffer irreparable harm" because "analysis of [that] factor dispose[d] of the[] motions." 758 F.2d 669, 674 (D.C. Cir. 1985). And just last year, the Court of Appeals unequivocally held that "a showing of irreparable harm is a necessary prerequisite for a stay."[1] *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 64 (D.C. Cir. 2024). The Court therefore evaluates Plaintiffs' requests for a stay and a preliminary injunction under the same post-*Winter*, four-factor framework.[2]

Under that standard, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

---

[1] Although that decision involved a request for a stay pending appeal, the Court of Appeals relied on *Wisconsin Gas Co.*—a case about staying agency actions—for its pronouncement about the standard for stays in general. *See KalshiEX*, 119 F.4th at 64.

[2] This Court and several other courts within this District have routinely taken this approach when evaluating motions for a stay under the APA. *See, e.g.*, *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) ("The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay."); *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020); *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 45 (D.D.C. 2020) *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, No. 21-cv-00094, 2021 WL 3609986, at *2 (D.D.C. Apr. 4, 2021); *Cabrera v. U.S. Dep't of Lab.*, No. 25-cv-01909, 2025 WL 2092026, at *2 (D.D.C. July 25, 2025); *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-00872, 2025 WL 2192986, at *12 (D.D.C. Aug. 1, 2025).

equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The last two factors merge where the government is a party because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Although the Court of Appeals has explained that the Supreme Court's decision in *Winter* "can be read to require movants to establish *each* preliminary injunction factor independently," the Court of Appeals has not explicitly rejected the sliding-scale approach under which a plaintiff's "failure to establish one of the four factors does not always doom its motion for a preliminary injunction." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025). Yet under either approach, a plaintiff's "failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *accord Clevinger*, 134 F.4th at 1236. And it is clear that "[a] preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

**B.    Irreparable Harm**

The standard for "irreparable" harm is "high." *Chaplaincy*, 454 F.3d at 297. A plaintiff must establish that "[t]he injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm" and that the injury is "beyond remediation." *Id.* (citation and internal quotation marks omitted). In other words, the "injury 'must be both certain and great.'" *Clevinger*, 134 F.4th at 1234 (quoting *Wis. Gas Co.*, 758 F.2d at 674).

Plaintiffs fail to meet that high bar. As a threshold matter, Plaintiffs appear to conflate an injury-in-fact sufficient to establish standing under Article III of the Constitution and irreparable harm sufficient to warrant a stay or preliminary injunction. The section of their motion dedicated

to this factor argues that they have standing to raise violations of the Marine Mammal Protection Act because they are suffering cognizable injuries-in-fact due to the ongoing construction of Empire Wind 1. ECF 17-1 at 13–18. But their motion hardly attempts to establish that "[t]he injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm" and that the injury is "beyond remediation." *Chaplaincy*, 454 F.3d at 297 (citation and internal quotation marks omitted). Plaintiffs' focus on their standing is largely misplaced because an "injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018).

Even interpreting Plaintiffs' claimed injuries charitably, they have failed to establish irreparable harm that is "certain and great." *Chaplaincy*, 454 F.3d at 297 (citation and internal quotation marks omitted). Plaintiffs argue that the ongoing disruptions to the bottlenose dolphins will negatively impact Captain Shinn's whale and dolphin watching business and deprive Stern of the ability to derive aesthetic enjoyment from observing whales and dolphins. The most concrete evidence that Plaintiffs put forth to support these allegations is a declaration from Captain Shinn stating that "[w]e have noticed an increase in whale carcasses floating in the waters where we do business" and that "[w]hen we encounter these dead whales on our trips, our customers become upset, which discourages them from returning for another tour, and leads them to write negative reviews, further discouraging prospective customers." ECF 17-3 at 4.

This theory of irreparable harm suffers from numerous flaws. To start, Plaintiffs ignore the distinction between Level A and Level B harassment under the Marine Mammal Protection Act. The statute defines Level A harassment as "any act of pursuit, torment, or annoyance which . . . has the potential to injure a marine mammal or marine mammal stock in the wild" and Level B

harassment as "any act of pursuit, torment, or annoyance which . . . has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns." 16 U.S.C. § 1362(18).  Because the Letter of Authorization permits only Level B harassment takings of bottlenose dolphins, and does not authorize any Level A harassment whatsoever, Plaintiffs fail entirely to demonstrate how construction of Empire Wind 1 will lead to "dead . . . dolphins."  ECF 17-3 at 4.  It is also far from clear that any potential disruption of the dolphins' movement patterns is "great" enough to constitute irreparable harm.  *Wis. Gas Co.*, 758 F.2d at 674; *cf. Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 66 (D.D.C. 2017) (distinguishing between the existence of "irreparable harm where the challenged defendant is taking action that could kill (or seriously injure) significant numbers of animals" and the lack of irreparable harm where the defendant "does not intend to eradicate any healthy animals" and "the risk of serious physical harm to the [animals] is quite low").  And, of course, Plaintiffs' only claim here relates to the Level B harassment of bottlenose dolphins; they do not challenge the project as to any other marine mammal (including whales).

In addition, Plaintiffs fail to establish that the construction for Empire Wind 1 is actively harming dolphins—especially given the significant mitigation efforts in place.  Although Plaintiffs argue that construction will "disturb" the dolphins in a way that makes it more difficult to observe them for recreational and aesthetic purposes, ECF 17-1 at 16–18, "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur," *Wis. Gas Co.*, 758 F.2d at 674.  Plaintiffs contend that NMFS's approval of the Letter of Authorization "concede[s]" that Empire Wind 1 construction "will disturb dolphins and whales" because it allows Level B harassment of 31.9 percent of one species of dolphin.  ECF 17-1 at 16 & n.25.  But this argument once again overlooks the statutory definition of Level B harassment,

9

which covers "any act of pursuit, torment, or annoyance which . . . *has the potential to* disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns." 16 U.S.C. § 1362(18)(A)(ii), (D) (emphasis added).  That the Letter of Authorization approved activities that "ha[ve] the potential to disturb" dolphins does not demonstrate that Empire Wind 1 is in fact actively or imminently disrupting dolphins in a way that could cause irreparable harm to Plaintiffs.  *Id.*  In fact, the Letter ensures that "impacts are minimized through implementation of mitigation measures, including soft-starts, use of a sound attenuation system, the implementation of clearance zones that would facilitate a delay of pile driving commencement, and the implementation of shutdown zones."  89 Fed. Reg. at 11405.  And based on these mitigation efforts, NMFS concluded that "no serious injury or mortality is expected or authorized for any species or stock."  *Id.* at 11403.

That Plaintiffs waited so long to request a stay or preliminary injunction also suggests that their injuries are not certain and great.  "An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."  *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005).  The Court of Appeals has explained that waiting 44 days before seeking an injunction is "inexcusable," *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975), and other courts within this District have held that a two-month delay "militates against a finding of irreparable harm," *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000).  Plaintiffs waited significantly longer before moving for a stay or preliminary injunction here.  By the time that they filed their motion on August 21, 2025, it had been 18 months since the Letter of Authorization was approved and took effect, 17 months since Save Long Beach Island and Stern amended their complaint to challenge that Letter in the District of New Jersey, and 16 months since construction for Empire Wind 1 began.  ECF

19-1 at 3, 5. Plaintiffs' rebuttal that offshore pile driving—the leading source of harassment—did not commence until June 2025 is unpersuasive.³ ECF 22 at 15–17. When evaluating whether a delay implies a lack of irreparable harm, courts consider the date an action was authorized—not just when it takes effect. In *AARP v. EEOC*, for example, a court in this District concluded that the plaintiff's "unexplained delay in bringing this suit weigh[ed] against a finding of irreparable harm" where a final rule was promulgated in May 2016 and set to apply in January 2017 but not challenged in court until October 2016. 226 F. Supp. 3d 7, 22 (D.D.C. 2016). By extension, that a particular stage of construction did not begin until later does not excuse Plaintiffs' failure to timely seek injunctive relief. Given these considerations, Plaintiffs have not met their burden to establish irreparable harm.⁴ *See Chaplaincy*, 454 F.3d at 297.

---

³ Plaintiffs also argue that they could not move for a stay or preliminary injunction immediately after filing suit because they had to wait to complete service of process. ECF 22 at 17. This contention is unconvincing for multiple reasons. First, Plaintiffs could have moved for emergency relief concurrently with filing the action. Second, even if the Court did not consider this gap, the nearly year-and-a-half delay between when NMFS approved the Letter of Authorization and when Plaintiffs filed this suit is more than enough to "impl[y] a lack of urgency and irreparable harm." *Newdow*, 355 F. Supp. 2d at 292.

⁴ The Supreme Court's observation in *Amoco Production Co. v. Village of Gambell* that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable" does not change the Court's conclusion. 480 U.S. 531, 545 (1987). The discussion of whether environmental injuries can be "adequately remedied," *id.*, suggests that this statement is relevant to whether a harm is "beyond remediation"—not necessarily whether it is "certain and great," *Chaplaincy*, 454 F.3d at 297 (citation and internal quotation marks omitted). Indeed, the Supreme Court expressly cautioned that a preliminary injunction would be appropriate only "[i]f such injury is sufficiently likely." *Amoco Prod.*, 480 U.S. at 545. Accordingly, even if the Court assumes that the alleged ongoing violation of the Marine Mammal Protection Act cannot be fully remedied later, Plaintiffs have still not met the high bar for irreparable harm because they fail to establish that any harm related to the dolphins is "both certain and great." *Wis. Gas Co.*, 758 F.2d at 674.

### C.     Balance of Equities/Public Interest

Although the lack of irreparable harm is enough on its own to reject Plaintiffs' request for a stay or preliminary injunction, *see KalshiEX*, 119 F.4th at 64; *Clevinger*, 134 F.4th at 1236, the Court briefly addresses the balance of equities because that factor further supports the conclusion that Plaintiffs are not entitled to relief at this stage.[5]  "The balance of the equities weighs the harm to [Plaintiffs] if there is no injunction against the harm to the [government and Empire Wind] if there is." *Pursuing Am.'s Greatness*, 831 F.3d at 511.  Because halting construction would impose substantial costs and likely upend Empire Wind's ability to finish the project, the equities do not favor Plaintiffs.

In particular, construction of Empire Wind 1 is proceeding on a sequential schedule such that a delay in one phase "will cause a ripple effect across the overall schedule that will likely lead to Project cancellation." ECF 19-2 at 8.  Illustrative of this strict schedule, if the Court granted emergency relief to Plaintiffs that prevented Empire Wind from finishing installation of the monopile foundations for the wind turbines by the end of October 2025, the entire project would be put in jeopardy because the specialized ship for this kind of installation is not available during the entirety of 2026.  *Id.*  Empire Wind has entered numerous time-sensitive contracts for future stages of construction, so there is a substantial risk that a stay or injunction would cause it to both lose any benefit from the $3 billion it has already invested in the project and face $850 million in termination fees for violating deadlines in the contracts.  *Id.* at 9–10.  Furthermore, Empire Wind would likely have to forfeit an $87 million security it paid to the New York State Energy Research

---

[5] The lack of irreparable harm also makes it unnecessary to assess the likelihood of success on the merits. *See Wis. Gas Co.*, 758 F.2d at 674.  The Court notes, however, that the government and Empire Wind have made some showing at this stage to suggest that Plaintiffs may not ultimately prevail on the merits.

and Development Authority, and it would likely have to spend up to $250 million to dismantle and safely dispose of components that were custom-made for the project. *Id.* at 10. The government's—and thereby the public's—interest would also be negatively affected by the loss of thousands of jobs and a new source of clean energy that would result from the derailment of construction. *Id.* at 10–11. It is therefore evident that "substantial harm will result to defendants and to the public interest if this integrated and ongoing public project is halted by a preliminary injunction."[6] *Randolph Civic Ass'n v. WMATA*, 469 F. Supp. 968, 971 (D.D.C. 1979).

Plaintiffs' arguments for why the balance of equities nonetheless tips in their favor are unpersuasive. First, Plaintiffs contend that "Empire Wind's potential sunk costs are at least partially self-imposed" because it proceeded with the project despite knowing that the Letter of Authorization permitted a very large take of dolphins and that there was active litigation challenging the project. ECF 17-1 at 18–19. But this argument improperly mixes the likelihood of success on the merits factor into the balance of equities inquiry and, if taken to its logical conclusion, would allow the mere filing of a lawsuit to trump even the most serious of harms that could result from a stay or injunction. Second, Plaintiffs argue that the harm from the denial of emergency relief outweighs the harm from the granting of emergency relief because excessive takings of the dolphins constitute a serious environmental injury. *Id.* at 19–20. This contention fails, however, because, as discussed above, NMFS determined that "no serious injury or mortality is expected or authorized for any species or stock" given the mitigation measures and Plaintiffs

---

[6] Plaintiffs' aforementioned delay in seeking to stay or enjoin the effect of the Letter of Authorization has compounded these harms. *See Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, No. 15-cv-01582, 2016 WL 420470, at *12 (D.D.C. Jan. 22, 2016) ("Had Plaintiff filed this lawsuit in, for example, February 2015, the court likely would have resolved the dispute before the commencement of road work or mining activities, thereby obviating the need for the extraordinary relief requested.").

have failed to establish that the dolphins are actively being harmed by the construction.[7]  89 Fed. Reg. at 11403–05.  Third, Plaintiffs contend that the potential harm of pausing construction is overstated because "the putative climate benefits of the project are highly uncertain."  ECF 17-1 at 21–22.  Yet this argument ignores that the relevant government actors have already determined that the benefits of the project outweigh the downsides and is unresponsive to Empire Wind's concerns about the significant costs it would likely incur if construction were delayed.

### III.   CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' Motion for a Stay or Preliminary Injunction, ECF 17.  The Court will issue an order contemporaneously with this decision.

DATE:  October 24, 2025

CARL J. NICHOLS
United States District Judge

---

[7] The out-of-circuit case that Plaintiffs rely on regarding environmental injuries has minimal relevance here because it concerned "[t]he public interest in the *survival* and flourishing of marine mammals and endangered species" that was threatened by conduct that involved both Level A and Level B harassment.  *Nat. Res. Def. Council, Inc. v. Evans*, 232 F. Supp. 2d 1003, 1019, 1053 (N.D. Cal. 2002) (emphasis added).  Moreover, there was substantial evidence that marine mammals were being harmed by the activities being challenged.  *See id.* at 1053 ("It is undisputed that marine mammals, many of whom depend on sensitive hearing for essential activities like finding food and mates and avoiding predators, and some of whom are endangered species, will at a minimum be harassed by the extremely loud and far traveling LFA sonar.").  Neither is present here.